STEPHANIE S. CHRISTENSEN
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
KHALDOUN SHOBAKI (Cal. Bar No. 232864)
Assistant United States Attorney
Deputy Chief, Cyber & I.P. Crimes Section
LAUREN RESTREPO (Cal. Bar No. 319873)
Assistant United States Attorney
Cyber & I.P Crimes Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0759/3825
     Facsimile: (213) 894-2927
     E-mail:   khaldoun.shobaki@usdoj.gov
               lauren.restrepo@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>GUEORGUI HRISTOV PANTCHEV,<br><br>      Defendant. | No. 2:21-CR-50-JFW<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT GUEORGUI HRISTOV PANTCHEV<br><br>Hearing Date: September 26, 2022<br>Hearing Time: 8:00 a.m.<br>Location:     Courtroom of the<br>              Hon. John F. Walter |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California, and Assistant United States Attorneys Khaldoun Shobaki and Lauren Restrepo hereby files its Sentencing Position for defendant Gueorgui Hristov Pantchev in the above-captioned case.

1      The Government's Sentencing Position is based upon the attached

2  memorandum of points and authorities, the files and records in this

3  case, and such further evidence and argument as the Court may permit.

4  Dated: September 12, 2022     Respectfully submitted,

5                              STEPHANIE S. CHRISTENSEN
                                 Acting United States Attorney

6

7                              CHRISTOPHER D. GRIGG
                                 Assistant United States Attorney
                                 Chief, National Security Division

8

9                                        /s/
                              KHALDOUN SHOBAKI

10                              LAUREN RESTREPO
                              Assistant United States Attorneys

11

12                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3    TABLE OF AUTHORITIES................................................ii

4    MEMORANDUM OF POINTS AND AUTHORITIES...............................1

5    I.   INTRODUCTION..................................................1

6    II.  DEFENDANT'S CRIMINAL CONDUCT..................................2

7         A.   Defendant's Stalking Campaigns Against the Victims.......2

8              1.   Prior Stalking of Victims C and D...................2

9              2.   Post-Incarceration Stalking........................3

10        B.   Harm to Victims..........................................4

11   III. APPLICABLE GUIDELINES RANGE AND PRESENTENCE INVESTIGATION
          REPORT.......................................................5

12

     IV.  GOVERNMENT'S SENTENCING RECOMMENDATION........................6
13

14        A.   The Nature, Circumstances, and Seriousness of the
               Offense, and the Need to Provide Just Punishment,
               Warrant a Consecutive Sentence on Each Count.............8
15

16        B.   The History and Characteristics of Defendant Support
               Consecutive Sentences...................................10

17        C.   Specific Deterrence, the Need to Promote Respect for
               the Law, and the Need to Protect the Victims and the
18             Public Also Support Consecutive Sentences...............11

19        D.   A $100,000 Fine is Appropriate..........................13

20   V.   CONCLUSION...................................................14

21

22

23

24

25

26

27

28

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**Cases**

United States v. Jarvis,
   606 F.3d 552 (8th Cir. 2010) .................................. 7

United States v. Lymon,
   905 F.3d 1149 (10th Cir. 2018) ............................. 6, 7

United States v. Rangel,
   697 F.3d 795 (9th Cir. 2012) ................................. 6

**Statutes**

   18 U.S.C. § 802-03 ......................................... 6
   18 U.S.C. § 2261A .......................................... 5
   18 U.S.C. § 3553 ................................. 6, 8, 11, 14
   18 U.S.C. § 3584 ........................................... 6

**Other**

   USSG § 2A6.2 ............................................... 5
   USSG § 3D1.4 ............................................... 5
   USSG § 5E1.2 ........................................... 13, 14
   USSG § 5G1.2 ............................................... 6
   USSG § 5K2.1 .............................................. 11

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

From July 2019 until he was arrested in January 2021, defendant Gueorgui Hristov Pantchev ("defendant") engaged in extensive cyber stalking campaigns against multiple victims designed to harass, intimidate, and humiliate the victims and their families.  As detailed below, for years, defendant tormented women who worked at Veterans Affairs Medical Facilities throughout the Los Angeles area. Defendant harassed the victims relentlessly, bombarding VA email inboxes, often multiple times a day, with messages filled with harassing, abusive, and derogatory claims about the victims. Defendant also distributed insulting and offensive flyers about two of the victims around Los Angeles and at VA facilities.

When victims reported defendant's harassment to VA supervisors and law enforcement, defendant escalated his attacks.  Defendant intentionally inflicted emotional distress on his victims.  He terrified and terrorized them for years.  The women feared not only for their privacy, their reputations at work, their relationships with their patients, employers, and communities, but also for their physical safety and the safety of their families.

The government recommends a sentence of 48 months' imprisonment on each count, to be served consecutively, for a combined sentenced of 192 months' imprisonment; followed by a three-year term of supervised release on each count, to be served concurrently; a $100,000 fine; and a mandatory special assessment of $400.  This recommended variance is based on the record in this case, and on the additional aggravated facts set forth below and not adequately captured by the guidelines, including the number of victims, the

1

alarming and escalating nature of defendant's harassment, the disturbing pattern of cyberstalking, combined with the need to provide adequate deterrence to defendant and protect the public and victims from further crimes by defendant.

## II.   DEFENDANT'S CRIMINAL CONDUCT

As set forth in detail in the Complaint (Dkt. 1), Indictment (Dkt. 23), Government's Trial Memorandum (Dkt. 181), and Presentence Investigation Report ("PSR") (Dkt. 231), from approximately July 2019 until he was arrested in January 2021, defendant repeatedly cyberstalked, harassed, and threatened four VA doctors.  Defendant was convicted at trial of stalking four women -- Victims A through D. Defendant's stalking campaigns against Victims A, B, C, and D were also described extensively during defendant's five-day trial.  The Court is familiar with defendant and with the trial testimony, but a summary of defendant's conduct is highlighted here:

### A.   Defendant's Stalking Campaigns Against the Victims

#### 1.   Prior Stalking of Victims C and D

Defendant first met Victims C and D when he interacted with them at the Veterans Affairs facility in West Los Angeles ("West LA VA") in 2011 and 2009, respectively.  (PSR ¶ 4-5.)  After meeting the victims, defendant began sending them harassing and intimidating emails and messages.  (Id.)  Defendant also had several harassing physical encounters with Victim D at the West LA VA.  (Id.)  For months, defendant sent dozens of harassing emails to the victims, some containing overt threats of violence.

Defendant was charged with stalking and witness intimidation in violation of California law for stalking Victims C and D throughout 2011 and 2012.  (PSR ¶ 67.)  On May 16, 2014, defendant was convicted

2

1    after a jury trial, where Victims C and D testified against him.

2    (Id.)  During the trial, defendant engaged in numerous outbursts

3    intended to further intimidate and frighten Victims C and D.

4    Defendant was sentenced to 100 months' incarceration.  State records

5    show that he was paroled approximately three years after his

6    conviction, on September 19, 2017, and discharged from parole on

7    September 18, 2020.  (Id.)  The terms of defendant's parole barred

8    him from the West LA VA, and after he was released from custody,

9    defendant moved to Loma Linda, where he soon began stalking

10   additional female VA employees, including Victims A and B.

                    2.   Post-Incarceration Stalking

12        After his release from prison, defendant began visiting the

13   Veterans Affairs medical facility in Loma Linda ("Loma Linda VA").

14   (PSR ¶ 7.)  Defendant engaged in a wide range of disruptive behavior

15   at the Loma Linda VA, leading to restrictions on his access to the VA

16   campus.  (PSR ¶ 8.)  Those restrictions were put in place by the Loma

17   Linda VA's Disruptive Behavior Committee ("DBC").  During this

18   timeframe, Victim A served in a leadership role on the DBC.  (Id.)

19   At Loma Linda, defendant often visited the emergency room for

20   services – during one of these visits, defendant met Victim B, an

21   emergency room physician.  (PSR ¶ 9.)

22        In July 2019, while still on parole for his stalking of Victims

23   C and D, defendant resumed a similar pattern of harassment with

24   respect to all four victims.  (PSR ¶ 12.)  Defendant emailed a

25   variety of sexually explicit, vulgar, threatening, and misogynistic

26   messages to dozens of VA email addresses, including those of Victims

27   A and B.  During the summer of 2020, defendant sent a series of

28   lengthy emails containing offensive and threatening messages about

                                    3

Victims A-D to numerous VA email addresses -- including those of supervisors and coworkers of Victims A-D.  Defendant also mailed physical copies of the same email content to senior West LA VA leadership.

In addition to his lengthy and harassing emails, in late 2020 and early 2021, defendant created and distributed a series of flyers featuring Victims C and D.  (PSR ¶ 13.)  The flyers included large photographs of the women, false claims about them engaging in sex acts with patients and coworkers, derogatory claims, insults, and personal contact information.  These flyers were widely distributed around Los Angeles and at the West LA VA.  Defendant also created a series of flyers focused on Victim D, some of which included her home address, purporting to be an invitation for strangers to come have sex with Victim D, and claiming that she enjoyed sex with underage boys.  Defendant widely distributed these sex party flyers, including at the elementary school attended by Victim D's child.  Defendant's distribution of flyers continued through the morning of his arrest.

By the time of his arrest in January 2021, defendant had sent dozens of terrorizing messages to his victims and their colleagues and distributed hundreds of flyers throughout Los Angeles.

**B.  Harm to Victims**

As presented throughout the trial, and as anticipated in the victims' impact statements, defendant caused immense and long-lasting harm to his victims.  The victims feared not only for their privacy but also the damage defendant's conduct could inflict on their relationships with their patients, coworkers, and communities.  Several victims feared for their personal safety and the safety of their family members.

The emotional injuries defendant intentionally inflicted were severe.  Victims were afraid to go to work, leave their homes, and some installed security devices at their residences.  They also significantly curtailed their normal lives by deleting online accounts, working remotely, changing their routes to and from work, or running safety drills at their home.  Victims testified that they feared being followed or defendant finding their homes.  Ultimately, defendant's conduct was manifestly harmful and specifically designed to terrorize the victims and their families.

**III. APPLICABLE GUIDELINES RANGE AND PRESENTENCE INVESTIGATION REPORT**

In July 2022, after a five-day trial, a jury found defendant guilty of four counts of stalking related to his harassment and intimidation of Victims A-D.[1]  On August 25, 2022, the USPO disclosed the PSR and its recommendation letter.  (Dkt. 230 (Recommendation Letter); Dkt. 231.)  The USPO determined that defendant's Total Offense Level was 24, based on the following calculations:

| | | | |
|---|---|---|---|
| Base Offense Level | | | |
| 18 U.S.C. § 2261A(2)(B): | 18 | | USSG § 2A6.2(a) |
| Specific Offense Characteristics: | | | |
| Pattern of Activity Involving Stalking, Threatening Same Victim | +2 | USSG § 2A6.2(b)(1)(E) | |
| Combined Offense Level: Ungrouped Counts 1-3 | +4 | | USSG § 3D1.4 |
| Total Offense Level: | 24 | | |

---

[1] Defendant was indicted on five counts, but the government elected to proceed to trial on four of those counts.  At sentencing the government will move the Court to dismiss the remaining count.

The government concurs with the USPO's calculation of a Total Offense Level of 24.  (PSR at ¶¶ 23-61.)  The government also agrees with the USPO's determination that defendant is in Criminal History Category III.  (PSR ¶¶ 66-71.)  A total offense level of 24 with a Criminal History Category III corresponds to a guidelines range of 63-78 months' imprisonment.  (PSR ¶ 97.)  As noted in the PSR, the statutory maximum sentence for each count of conviction is 60 months; thus, the maximum term of imprisonment on all counts is 240 months. (PSR ¶ 96.)  The government respectfully requests that the Court adopt the factual findings and calculations of the PSR in this matter.

## IV. GOVERNMENT'S SENTENCING RECOMMENDATION

For the reasons set forth in this sentencing memorandum, and in accordance with the factors set forth in § 3553(a), the government believes that consecutive sentences on each count resulting in a sentence above the advisory guidelines is warranted in this case. The Court may impose a sentence outside the advisory guidelines range, including consecutive sentences as a variance under § 3553(a). See United States v. Rangel, 697 F.3d 795, 802 (9th Cir. 2012).  The Court has "discretion to determine whether to impose multiple sentences concurrently or consecutively under 18 U.S.C. § 3584(a)." Id. at 802-03.  In so deciding, the Court "shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."  Id. (quoting 18 U.S.C. § 3584).  Like the rest of the guidelines, the provisions of U.S.S.G. § 5G1.2 that included mandatory language about concurrent sentencing are advisory.  See United States v. Lymon, 905 F.3d 1149, 1153 (10th Cir. 2018) (collecting cases).

When a consecutive sentence varies from the guidelines, the sentencing court should articulate, during sentencing, its reasons for the variance.  For example, the Lymon court imposed a consecutive sentence of 216 months when the advisory guidelines range was 77 to 96 months, and the Tenth Circuit affirmed.  905 F.3d at 1151.  The district court there, at sentencing, discussed the defendant's "serious and ongoing criminal history," and concluded that he was "a repeat and dangerous offender who poses a serious danger to the community and has no respect for the law."  Id. at 1156.  See also United States v. Jarvis, 606 F.3d 552, 554 (8th Cir. 2010) ("Jarvis was undeterred by prior incarceration."); United States v. Conlan, 785 F.3d 380, 394 (5th Cir. 2015) (affirming an above-guidelines 96-month sentence in stalking case).

Here, the guidelines range is 63 to 78 months, which is above the statutory maximum sentence of 60 months for each of the four counts of conviction.  (PSR ¶¶ 96-97.)  The government believes that consecutive sentences resulting in an upward variance is appropriate. In particular, the targeting of multiple victims, the nature and detail of the harassment and intimidation directed at the victims and their families, the extent of the fear and harm intentionally inflicted, and defendant's alarming escalating pattern of stalking, particularly in light of his prior convictions, warrant a significant custodial sentence.

In considering all of the aggravating facts present in this case not accounted for in the sentencing guidelines, the government recommends that the Court impose the following sentence: (a) 48 months' imprisonment on each count, to be served consecutively for a total term of imprisonment of 192 months; (b) three years of

supervised release on each count, to be served concurrently; (c) a
$25,000 fine on each count, for a total of $100,000; and (d) a
mandatory special assessment of $400.  The government believes this
sentence is sufficient but not greater than necessary to meet the
sentencing goals of 18 U.S.C. § 3553(a).

> **A.   The Nature, Circumstances, and Seriousness of the Offense,
> and the Need to Provide Just Punishment, Warrant a
> Consecutive Sentence on Each Count**

As made clear in the Complaint, Indictment, PSR, and throughout
defendant's trial, defendant's stalking campaigns were extraordinary
for how extensive, persistent, and pernicious they were and for the
trauma he willfully inflicted on the victims.  Defendant's motives
for doing so were plain.  In his own words, each of the victims had
"done him dirty" in some way; either by refusing his romantic
advances, reporting his actions to VA administrators and law
enforcement, or by restricting his access to VA facilities.  In his
mind, his attacks were justified payback.

When defendant's harassment did not have the desired effect
(e.g., agreeing to meet him for coffee or removing restrictions
placed on him at the VA facilities), his emails and mailings became
more frequent and more offensive.  He flooded VA email inboxes for
months with abusive and demeaning statements about the victims.  But
defendant's stalking was not limited to online abuse and
intimidation.  In July 2020, he posted signs in Victim A's community
with her name and advertising a sex act for money.  In the fall of
2020, defendant began littering the West LA VA campus with hundreds
of full-page color flyers containing photos of the Victims C and D
and offensive statements about the victims, their spouses, and
siblings.  Beyond the West LA VA campus, defendant began hunting for

1    locations where the victims could be found, including their schools

2    and homes.  Defendant then mass distributed hundreds of flyers at

3    targeted locations throughout the city for maximum emotional impact,

4    including at their coworkers' homes, at alma maters, at family homes

5    and rental properties, and -- perhaps most alarming -- the elementary

6    school of Victim D's child.  In the case of Victim D, these flyers

7    included her home address and invitations for sex parties and at her

8    home.  Indeed, defendant directed much of his vitriol at Victim D and

9    her family, appearing to take pleasure in tormenting her.

10        In his emails, mailings, and flyers, defendant included private

11   details about the victims and their families, including family

12   members' names, photos, and contact information, all of which was

13   specifically designed to humiliate the victims and guarantee that

14   they learned of the emails and flyers.  As Victims C and D testified

15   during trial, over several months they each received calls and

16   messages from friends, coworkers, and strangers -- sometimes multiple

17   times a day -- alerting them to the emails and flyers, thereby

18   retraumatizing the victims over and over again.  Defendant's conduct

19   demonstrates a disturbing and escalating pattern of stalking designed

20   to inflict damage on every aspect of the victims' lives.  As

21   intended, defendant's stalking crimes caused each of the victims

22   substantial emotional distress.

23        Moreover, defendant unquestionably knew what he was doing was

24   not only harmful but illegal.  As noted above, in 2012 he was

25   arrested and charged with multiple counts of stalking and witness

26   tampering in connection with his stalking of Victims C and D in 2011

27   and 2012.  In 2014, he was tried, convicted, and sentenced to over 8

28   years imprisonment.  During his state court trial, both Victims C and

9

D testified about the dozens of harassing and threatening emails defendant sent them.  Having heard the testimony of Victims C and D during his state court trial, defendant was well aware of the devastating emotional impact his harassment had on the victims and their families.  But defendant did not care, and he refused to stop.

Upon release from state prison, defendant's stalking campaigns began again -- this time against even more victims -- and did not stop until he was arrested by federal agents in January 2021, after driving to Victim D's home and her child's elementary school and distributed dozens of flyers advertising sex parties.  During a search of his residence, federal agents found more copies of the same flyers, including more flyers yet to be printed.   The evidence unquestionably shows that had defendant not been arrested, his harassment and abuse would have continued.

**B.   The History and Characteristics of Defendant Support Consecutive Sentences**

The history and characteristics of this defendant support consecutive sentences on each count.  Here, defendant was honorably discharged from the Marine Corps in 2003, after which he obtained a master's degree and has lived independently for years.  (PSR ¶ 81-82.)  Defendant knew the difference between right and wrong and was fully aware that he was hurting others.  He also knew that he was committing serious crimes and facing the possibility of imprisonment. But he continued because he felt justified in sending the threats and he believed the victims deserved the abuse and humiliation.  In the months that followed various restrictions being placed on his access to the Loma Linda and West LA VA facilities, defendant had more than adequate time to reconsider his threats and abuse and abandon his

attempts at retribution.  But defendant did not stop.  In response, he escalated his harassment.

The government anticipates that defendant may argue that a departure for "diminished capacity" under USSG § 5K2.13 is warranted in this case based on a claim that defendant sustained a brain injury during his time in the Marines.  The application notes make clear that "significantly reduced mental capacity" under § 5K2.13 requires a significantly impaired ability to understand the wrongfulness of the behavior in the charged offense or to control the behavior the defendant knows to be wrong.  USSG § 5K2.13, n. 1.  Defendant plainly understood that what he was doing was wrong.  The guidelines also prohibit this kind of departure where, as here, "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved . . . a serious threat of violence" or "defendant's criminal history indicates a need to incarcerate the defendant to protect the public."  USSG § 5K2.13. Defendant's prior convictions for stalking two of the same victims show a profound need for the sentence here to protect the public.

Moreover, even if defendant's alleged medical issues are taken as true, they should not be used as a shield to allow defendant to avoid taking responsibility for his deliberate and predatory actions. They also cannot excuse or justify his conduct, nor can they lessen the trauma that the victims experienced as a result of his ongoing harassment.

**C.    Specific Deterrence, the Need to Promote Respect for the Law, and the Need to Protect the Victims and the Public Also Support Consecutive Sentences**

While the Court must, of course, consider all of the § 3553 factors at sentencing, the need for the sentence imposed to promote

11

respect for the law, provide adequate deterrence to defendant, and protect the victims and the public from further crimes of the defendant strongly support the imposition of a 192-month prison term in this case.  Here, defendant has a lengthy and established history of harassing and threatening the victims in this case, without provocation.  He did so knowing that what he was doing was not only illegal, but also undoubtedly causing the victims significant pain and humiliation.  Indeed, that was exactly defendant's intent.  His attacks were personal, and they were relentless.

In the case of Victims C and D, defendant tormented them for years.  Defendant's repeated abusive and vindictive conduct against these victims since meeting them in 2009 and 2011 makes clear that defendant is determined to harm these women in any and every way possible.  After spending years in state prison for stalking Victims C and D, upon release from custody, defendant made it his mission to seek revenge and seemed singularly focused on damaging every aspect of their lives.

What's more, defendant expanded his harassment campaigns to additional victims in 2019.  Victim A was harassed and intimidated for over a year after the VA placed restrictions on defendant's access to VA facilities.  Defendant's harassment included dozens of harassing emails about Victim A to numerous colleagues and signs posted in her community with her name and advertising a sex act for money.  Defendant began stalking Victim B after two brief interactions with her at the Loma Linda VA in 2019 and 2020.  Over more than 6 months, defendant sent harassing and intimidating emails to Victim B when she did not reciprocate his romantic advances.

Defendant's numerous derogatory references to the victims, their family members and their colleagues demonstrate that defendant was on a quest to harass, intimidate, and humiliate each of the victims. His conduct during the course the trial in this case -- and in every pretrial proceeding in this case -- further demonstrates that defendant continues to be fixated on the victims.  Indeed, while Victim D was testifying during his trial, defendant yelled obscenities at her, threatened her life, and told her that "suicide is also an option."  Defendant's threating behavior and continuing attempts to harm the victims even after being arrested and charged a second time demonstrate that defendant poses a serious ongoing risk to the victims, their families, and the public.

Moreover, defendant's criminal history, escalating pattern of stalking, and continued persistence in stalking numerous victims even after being imprisoned demonstrates his total disregard for the law and thus militates in favor of a much greater sentence.  In particular, an upward variance is warranted because the instant crime shows a dangerous escalation to more abusive behavior, and defendant's repeated harassment of the victims and their families despite numerous law enforcement interventions makes clear that prison is not a deterrent for defendant.  Defendant plainly will not be deterred, and only a lengthy term of imprisonment can protect the public and the victims.

### D.   A $100,000 Fine is Appropriate

The applicable fine range for the offenses of conviction is $20,000 to $200,000.  (PSR ¶ 107.); USSG § 5E1.2(c)(3).  The government believes that a mid-range guidelines fine of $100,000 -- consisting of $25,000 on each of the three counts of conviction -- is

appropriate in this case.  Prior to his arrest, defendant lived in an apartment in Brentwood, drove a Dodge Challenger SRT Demon, and printed thousands of high-quality color flyers, suggesting that he had not-insignificant financial resources.  Defendant refused to provide the Probation Office any information about his financial condition.  (PSR ¶ 90.)

Pursuant to USSG § 5E1.2(a), the Court must impose a fine, unless the defendant establishes that he is unable to pay and is not likely to become able to pay.  The guidelines provide a list of factors courts should consider when determining the amount of the fine imposed, including the factors set forth in § 3553(a), as well as defendant's earning capacity and financial resources.  USSG § 5E1.2(d).  If a defendant establishes that payment of a fine in a lump sum at or prior to sentencing would have an unduly severe financial impact, the court can establish a reasonable installment schedule for payment.  USSG § 5E1.2(f).  Although the USPO is recommending no fine in this case, defendant has not provided any information -- let alone sufficient information -- to establish that he is unable to pay a required fine or that his current or future earning capacity make payment of a fine unduly burdensome.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: 48 months' imprisonment on each count, to be served consecutively for a total of 192 months' imprisonment; a supervised release term of three years on each count, to be served concurrently; a $100,000 fine; and the mandatory special assessment of $400.